# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE BIOZOOM, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) | Master File No. 1:14-cv-01087-JG <br><br> Judge James S. Gwin |

## LEAD PLAINTIFFS' SUR-REPLY TO DEFENDANTS' OMNIBUS MOTIONS TO DISMISS PLAINTIFFS' SECTION 12(a)(1) AND STATE-LAW CLAIMS

## ARGUMENT

I.  **The First Bona Fide Offering of Biozoom Securities by the Argentinean Shareholders Was on May 16, 2013, and Defendants' Biozoom Sales Are not Covered by the Dealer Exemption.**

Defendants belatedly submit a novel argument – that the bona fide offering date that started the 40-day window during which Defendants could not sell the unregistered Biozoom securities is now sometime in 2009 when Biozoom shares were supposedly first listed on the OTCBB. Fed. Reply Br. at 15-16 (Dkt. # 118). But such dubious quotations – the existence of which are contradicted by Entertainment Arts' own SEC filings, raise questions of fact not appropriate for adjudication in the context of this motion to dismiss.[1] Moreover, they were not quotations for the Biozoom securities *offered pursuant to the May, 2013 secondary offering,* because the May, 2013 securities were not even owned by the Argentinean Shareholders in 2009. Defendants must find an exemption for their sales in this *new, secondary* offering by the Argentinean Shareholders, started on May 16, 2013; but that they fail to do.

---

[1] Defendants submit Market Maker Price Movement Reports for February 24, 2009, August 31, 2009, and September 1, 2009 that purportedly show "numerous" quotes as "proof" that the Entertainment Art securities were quoted *for sale* on the OTCBB. *See* Fed. Reply Br. at 15 (Dkt. #118). In reality, the Reports show only two "ask" quotations – quotations to *sell* – for two shares each, that were supposedly posted (though not fulfilled) on a single day, September 1, 2009. Decl. of Michael V. Rella, Ex. A. ("Bid" quotations are quotations to *purchase*, not sell.) However, even the existence of the 2009 "ask" quotations is denied (thus suggesting the likelihood of an error in the Reports) by Biozoom's 2009-2012 Form 10-K annual filings, which acknowledge that "Our common stock is eligible to be traded on the Over-The-Counter Bulletin Board under the ticker symbol EERT. There has been no active trading in the Company's securities, and *there has been no bid or ask prices quoted*." Entertainment Art, Inc., Annual Report 3 (Form 10-K) (Jun. 6, 2009); Entertainment Art, Inc., Annual Report 3 (Form 10-K) (Jun. 18, 2010); Entertainment Art, Inc., Annual Report 6 (Form 10-K) (Jun. 29, 2011); Entertainment Art, Inc., Annual Report 6 (Form 10-K) (Jun. 7, 2012) (*emphasis added*). The parties agree that this Court may take judicial notice of reports filed with the SEC. The OTCBB Reports themselves acknowledge that the "possibility of human and mechanical errors as well as other factors" may cause "errors or omissions in the information."

Defendants' repeated assertions that this case is "unprecedented"[2] notwithstanding, the argument they now advance is precisely the same argument made by the dealers, opposed by the SEC, and rejected by the Court, in *Sec. & Exch. Com v. N. Am. Research & Dev. Corp.*, 280 F. Supp. 106 (S.D.N.Y. 1968). *North American Research* could hardly be clearer: a *new* 40-day "blackout" period for dealer liability starts running *each time* securities are offered in a *new* (secondary) distribution:

> Some defendants (Redroof, Rosen, Volante, Hunter and Dunhill) acted as "dealers" within the meaning of § 2(12), 15 U.S.C. § 77b(12), in the sale of the shares. They contend that they were entitled to a § 4(3) dealers' transaction exemption in their handling of the shares. Section 4(3), however, provides that the "dealer's transaction" exemption does not apply to "transactions taking place prior to the expiration of forty days after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter". (15 U.S.C.A. § 77d(3) (A)). Relying on this latter provision, ***the SEC contends that the 40-day period began running with respect to the new or secondary issue of North American shares when the tainted shares were first offered publicly in the United States in the latter part of June, 1967***, and that these dealers were not therefore entitled to transaction exemptions with respect to their distribution of *tainted stock* into the United States. ***The dealers reply that they are entitled to the exemption for the reason that the 40-day period had long since begun with the bona fide public offering of North American shares in January, 1933, when the company was organized and its stock was first distributed to the public.*** This raises the question of whether, even though the § 3(a)(1) exemption may be lost by reason of a new offering by an issuer or an underwriter, it remains with respect to dealers by virtue of the § 4(3) (A) exemption. The answer necessitates a review of the purpose of the 40-day requirement.

---

[2] While the numerous cases cited by both parties make it clear this case is far from unprecedented, what is unprecedented is the transition of numerous market makers – including several of the Defendants in this case – from stock trading by human traders to computerized (algorithmic) trading, also known as "high-frequency trading" ("HFT"). High frequency trading by market makers and potential stock market distortions and/or malfunctions caused by HFT have been the topic of recent congressional hearings, *see The Role of Regulation In Shaping Equity Market Structure And Electronic Trading*, *Hearing before the S. Comm. On Banking, Housing, and Urban Affairs*, 113th Cong. 2 (2014), *available at* http://www.banking.senate.gov/ (click "HEARINGS" tab). If discovery in this case shows that Defendants became entangled in the obvious pump-and-dump Biozoom scheme because they replaced their experienced traders with computer trading algorithms that may not have been able to replicate the skills of a long-trained, well-versed human trader in order to spot such schemes, this case may indeed be one of first impression – but as to its facts, not the applicable law.

>The purpose of the 40-day requirement was to prevent dealers from even unknowingly taking part in a distribution during that period. H.R. Rep. No. 85, 73d Cong., 1st Sess. (1933) 15; I Loss, Securities Regulation 183. In 1964, § 4(3) was amended to impose the requirement that a dealer furnish a prospectus for a period of 90 days after the commencement of a distribution in connection with transactions of registered securities of a company which had not been previously sold pursuant to an effective registration statement. The amendment was part of legislation designed to strengthen the regulation of over-the-counter broker-dealers. 2 U.S. Code Cong. & Admin. News, 88th Cong., 2d Sess. p. 3014 (1964). The Congressional design in enacting these provisions is to have the broker-dealer community act as guardians of the investing public by furnishing prospectuses when these are available. That purpose is effectuated by requiring that dealers make certain that the shares traded by them do not emanate from a controlling person who has made a public offering in the United States within the 40-day period prior to the time of the dealer's transaction. Professor Loss takes this view, stating that § 5 must be read as if applied to
>
>>"any transaction by an issuer or underwriter in connection with a 'primary' distribution (that is, a public offering) by the issuer, *or a 'secondary' distribution* by a person in a control relationship with the issuer, or any transaction by a dealer within forty days after the beginning *of such a distribution* or during such longer period as he personally may still be engaged in distributing." (I Loss at 183-84)
>
>It therefore must be concluded that the bona fide *new* offering of North American shares into the United States did not take place prior to June 27, 1967, when the stock first appeared in the Pink Sheets.

*Sec. & Exch. Com v. N. Am. Research & Dev. Corp.*, 280 F. Supp. 106, 124-25 (S.D.N.Y. 1968).

The *North American Research* court held that the dealers "[were] not entitled to § 4(3)(A) dealer's transaction exemptions *with respect to their purchase and sale of tainted North American shares*." *Id*. (*emphasis supplied*). By "tainted" shares, the court clearly meant the shares that had formerly been publicly offered,[3] were subsequently repurchased, and were offered *again* in the new, secondary (and fraudulent) distribution. *Id*. at 124.

The securities at issue in *North American Research* had already been publicly offered in 1933 and were later collected back by control persons of the issuer and – just as in Biozoom – re-

---

[3] Whereas here, the shares were never publicly offered.

3

issued in a secondary distribution in 1967. While the initial public offering apparently took place before the '33 Act was enacted, the *North American Research* court's analysis does not turn on that fact, but on the fact that the shares were subject to a "new offering." This treatment is entirely consistent with the Securities Act, which requires *each securities transaction* to either be registered or qualify for an exemption. *See SEC v. Cavanagh*, 155 F.3d 129, 137 (2d Cir. 1998) ("Section 4 provides exceptions to the registration requirement of Section 5 for specific transactions, indicating that registration of a security is transaction-specific.").

*North American Research* makes it clear that the forty-day period starts running when the "*tainted*" distribution – *i.e.* the distribution of unregistered securities at issue – begins. The date when the Biozoom securities *at issue* in this case were bona fide offered to the public under *North American Research* – *i.e.* the date that triggers the forty-day period *as to these securities* – is the date when they were first offered on the OTCBB: May 16, 2013. *See* SAC ¶¶ 80-87.

### A. Defendants' Request for Judicial Notice Regarding Purported "Bid" and "Ask" Quotations Is Improper and Ought Not Be Granted.

Defendants' request that this Court take judicial notice of purported "bid" and "ask" quotations of Entertainment Art shares from 2009 is improper and ought to be denied, because the records at issue (1) are not public records and (2) are not records that prove facts whose accuracy cannot reasonably be questioned. In the Sixth Circuit, "a court may only take judicial notice of a public record whose existence or contents prove facts whose accuracy cannot reasonably be questioned." *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005). "[I]n order to preserve a party's right to a fair hearing, a court, on a motion to dismiss, must only take judicial notice of facts which are not subject to reasonable dispute." *Id.*

Here, Defendants themselves admit that the "bid" and "ask" OTCBB records at issue are not public records. Defendants indicate they "purchased" the records from the OTCBB rather

4

than download them from a publicly-available OTCBB page, and that those records are "no longer available" on that website. Declaration of Michael V. Rella, ¶¶ 3-4. Defendants fail to disclose that, even worse, the entire OTCBB website is no longer available and its domain name now points to the FINRA website.

Further, the OTCBB records offered by Defendants purporting to show two (2) Biozoom "ask" quotations are certainly not records "whose accuracy cannot reasonably be questioned," as required by *Passa*. Entertainment Art's own 10-K annual filings covering the years when such quotes were supposedly posted indicate that "there has been no bid or ask prices quoted [for Entertainment Art]." Annual Report 3 (Form 10-K) (Jun. 6, 2009); Annual Report 3 (Form 10-K) (Jun. 18, 2010); Annual Report 6 (Form 10-K) (Jun. 29, 2011); Annual Report 6 (Form 10-K) (Jun. 7, 2012). Coupled with the fact that only two "ask" quotations were apparently entered, Entertainment Art's 10-K representations certainly raise reasonable questions regarding the accuracy of the OTCBB reports showing those two "ask" quotes. Those records are "subject to reasonable dispute" and, under the *Passa* court's instructions, are not appropriate for judicial notice.

The cases cited by Defendants are inapposite. They all refer to publicly-available stock prices (including the OTCBB prices at issue in *Thompson v. RelationServe Media, Inc.*, which were directly accessed – not purchased – by the court in that case via the OTCBB website), and did not include non-publicly available "bid" and "ask" quotations, but actual prices. *See Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 647 ns.14-15 (11th Cir. 2010), reviewed on publicly-accessible websites.

**B.     The Publication of Biozoom Quotes on the OTCBB by Defendants Was "Solicitation."**

The "solicitation of orders" is deemed to include "publication of quotes in the pink sheets." *SEC v. D'Onofrio*, 1975 U.S. Dist. LEXIS 12081, 18 (S.D.N.Y. 1975) (discussing the prohibition of such solicitations under old SEC Rule 154, subsequently replaced by Rule 144, which includes the same prohibition, *see* § 17 CFR 230.144 (g)(3)(ii)).  While Defendants did not act as brokers – that is, did not sell securities on behalf of others – but as dealers – that is, sold securities as principals – and cannot qualify for the broker exemption for that reason, Defendants' publication of Biozoom quotes on the OTCBB constitutes "solicitation" under *D'Onofrio*.

**II.    Plaintiffs' State-Law Claims Are *Not* Governed By The Federal Statute Of Limitations.**

Defendants contend that if Plaintiffs' Blue Sky and state common law claims are not completely preempted, the Federal statute of limitations nonetheless applies to those claims. But none of the cases Defendants cite actually reach such a holding. Although the plaintiffs in *Wuliger v. Christie*, 310 F. Supp. 2d 897 (N.D. Ohio 2004) brought claims under the Securities Act and state common law, the court addressed only the statute of limitations applicable to plaintiff's Federal claims. *Id.* at 908. It did not address whether plaintiff's state common law claims were equally barred by the same limitations period or otherwise which limitations period applied to them.

The remaining cases Defendants rely on do not arise from alleged securities violations and thus do not address the statute of limitations applicable to such claims either under state Blue Sky laws or state common laws. *See AT&T Communs. Of the Midwest v. Qwest Corp.*, No. 8:06cv823, 2007 U.S. Dist. LEXIS 14150 (D. Neb. Feb. 27, 2007) (arising from defendant's alleged failure to comply with the requirements of the Telecommunications Act pursuant to the

6

parties' interconnection agreements); *Arctic Express, Inc. v. Del Monte Fresh Produce NA, Inc.*, 366 B.R. 786 (S.D. Ohio 2007) (arising from alleged breach of agreements for interstate transportation services largely regulated by the Interstate Commerce Act); *Firstcom, Inc. v. Qwest Communs.*, 618 F. Supp. 2d 1001 (D. Minn. 2007) (arising from interconnection agreements under the Telecommunications Act); *Goetz v. N.C. HHS*, 203 N.C. App. 421 (N.C. Ct. App. 2010) (arising from dispute regarding causation of child's mental retardation and parents' claim for compensation under the federal and state childhood vaccine-related injury compensation programs).

Furthermore, unlike the limitations period for the Securities Act, the express language in each of the federal statutes at issue in Defendants' cases is broad enough to encompass all claims regardless of the law under which they were brought. For instance, the statute of limitations for the Telecommunications Act at issue in *AT&T Communs.* and *Firstcom*, applies to "*all* complaints against carriers for the recovery of damages not based on overcharges" and "actions at law 'for recovery of overcharges.'" *Firstcom*, 618 F. Supp. 2d at 1005 (emphasis added). *See also AT&T Communs.*, 2007 U.S. Dist. LEXIS 14150, at *8. Because the plaintiff's state-law claims fell "within the TCA's broad definition of claims against carriers," the TCA's limitations period applied to plaintiff's state-law claims. *Firstcom*, 618 F. Supp. 2d at 1005. Similarly, the statute of limitations for the Interstate Commerce Act ("ICA") at issue in *Arctic Express* applies to "*a civil action* to recover charges for transportation or service provided by a carrier." *Id*. at 790 (emphasis added). The court's application of the ICA statute of limitations to plaintiff's state-law claims was dependent on this express language. *Id*. By contrast, the statute of limitations under the Securities Act does not encompass "all complaints" or "civil actions" that may arise from the sale of unregistered securities. Rather, the express language of the Act

7

restricts application of the limitations period only to violations of the Securities Act itself. *See* 15 U.S.C. § 77m (statute of limitations applies to actions "maintained to enforce any liability created *under section 77k or 77l(a)(2) of this title*.") (emphasis added). Accordingly, it cannot be expanded, as Defendants attempt to do, to Plaintiffs' state-law claims.

The decision in *Goetz v. N.C. HHS*, 203 N.C. App. 421 (N.C. Ct. App. 2010) is equally unpersuasive. The court in *Goetz* recognized that the Federal Vaccine Act specifically addressed the timing of state law claims in relation to claims brought under the Act, holding that "a claimant must file a timely petition and exhaust all of the Federal Vaccine Act's requirements as a precondition to the maintenance of a valid state action." *Id*. at 428. Unlike the Federal Vaccine Act, the Securities Act does not require federal claims to be exhausted before a plaintiff may pursue his or her state-law claims.

Finally, Defendants cases are inapposite to the more relevant cases decided by District Courts within the Sixth Circuit. For example, in *Nolfi v. Ohio Ky. Oil Corp.*, 562 F. Supp. 2d 904 (N.D. Ohio 2008), plaintiff brought claims under the Securities Act, the Ohio Blue Sky laws, and Ohio common law, including breach of contract, for the defendant's alleged sale of unregistered securities. *Id*. at *906-07. The court granted summary judgment in favor of defendant on plaintiff's Securities Act claims because they were not brought within the one-year statute of limitations. *Id*. at 909. *See also Nolfi v. Ohio Ky. Oil Corp.*, Nos. 5:06CV260, 5:06CV506, 2008 U.S. Dist. LEXIS 39284, at *11 (N.D. Ohio May 12, 2008). However, plaintiff's Ohio Blue Sky and common law claims were not similarly time-barred and were permitted to proceed to trial. *Id*. at *12-22. *See also Pullins v. Klimley*, No. 05-cv-082, 2008 U.S. Dist. LEXIS 3467, at *36-37, *110-112 (S.D. Ohio Jan. 7, 2008) (applying federal one-year statute of limitations to plaintiff's Section 12(a)(1) claims and the state two-year statute of limitations to claims brought

under the Ohio Securities Act); *Gilbert Family Partnership v. Nido Corp.*, 679 F. Supp. 679 (E.D. Mich. 1988) (applying the federal one-year statute of limitations to plaintiffs' Sections 5, 11, and 12 claims under the Securities Act, the state two-year statute of limitations to claims brought under the Michigan Uniform Securities Act, and the state six-year statute of limitations to claims for fraud and breach of fiduciary duty under Michigan common law); *Genesee County Emples. Ret. Sys. v. Thornburg Mortg. Secs. Trust 2006-3*, 825 F. Supp. 2d 1082, 1226-27 (D.N.M. 2011) (applying the federal one-year statute of limitations to Plaintiff's Section 12(a)(2) claims under the Securities Act and the state two-year statute of limitations to Plaintiff's claims under the New Mexico Securities Act); *Nielsen v. Professional Financial Management, Ltd.*, 682 F. Supp. 429, 438, 440-41 (D. Minn. 1987) (granting motion to dismiss plaintiff's Section 12 claims under the Securities Act as barred by the federal one-year statute of limitations, but denying motion to dismiss Plaintiff's claims under the Minnesota Securities Act as timely filed within the applicable state three-year statute of limitations).

For the reasons discussed above, the Court should reject Defendant's contention that the one-year Federal statute of limitations applies to Plaintiffs' state-law claims.

Dated: December 16, 2014                              Respectfully Submitted,

                                                       *s/ Alan L. Rosca*
                                                       Alan L. Rosca (Ohio Bar No. 0084100)
                                                       James P. Booker (Ohio Bar No. 0090803)
                                                       **PEIFFER ROSCA WOLF**
                                                       **ABDULLAH CARR & KANE.**
                                                       **A PROFESSIONAL LAW**
                                                       **CORPORATION**
                                                       526 Superior Avenue, Suite 1255
                                                       Cleveland, Ohio 44114
                                                       Tel: 216-589-9280
                                                       Fax: 888-411-0038
                                                       Email: arosca@praclawfirm.com Email:
                                                       jbooker@praclawfirm.com

Joseph C. Peiffer (*admitted pro hac vice*)
**PEIFFER ROSCA WOLF
ABDULLAH CARR & KANE,
A PROFESSIONAL LAW
CORPORATION**
201 St. Charles Avenue, Suite 4610 New
Orleans, Louisiana 70170-4610 Tel:
(504) 523-2464
Fax: (504) 523-2464
Email: jpeiffer@praclawfirm.com
Paul J. Scarlato (*pro hac vice*)
**GOLDMAN SCARLATO & PENNY, P.C.**
101 E. Lancaster Avenue, Suite 204
Wayne, PA 19087
Tel: 484-342-0700
Fax: 484-580-8747
Email: scarlato@gskplaw.com

*Lead Counsel for Lead Plaintiff and the
Proposed Class*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(f)**

I, Alan L. Rosca, certify that the foregoing Sur-Reply adheres to the page limitations set forth in Local Rule 7.1(f). This case has been assigned to the standard track.

                                   *s/ Alan L. Rosca*
                                   Alan L. Rosca (Ohio Bar No. 0084100)
                                   **PEIFFER ROSCA WOLF ABDULLAH CARR & KANE, A PROFESSIONAL LAW CORPORATION**
526 Superior Avenue, Suite 1255
Cleveland, Ohio 44114
Tel: 216-589-9280
Fax: 888-411-0038
Email: arosca@praclawfirm.com

**CERTIFICATE OF SERVICE**

  I, Alan L. Rosca, certify that on December 16, 2014, a copy of the foregoing LEAD PLAINTIFF'S SUR-REPLY TO DEFENDANTS' OMNIBUS MOTIONS TO DISMISS PLAINTIFFS' SECTION 12(a)(1) AND STATE LAW CLAIMS, was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties who are not able to accept electronic filing will be served by regular U.S. mail. Parties may access this filing through the Court's system.

                *s/ Alan L. Rosca*
                Alan L. Rosca (Ohio Bar No. 0084100)
                **PEIFFER ROSCA WOLF**
                **ABDULLAH CARR & KANE,**
                **A PROFESSIONAL LAW**
                **CORPORATION**
                526 Superior Avenue, Suite 1255
                Cleveland, Ohio 44114
                Tel: 216-589-9280
                Fax: 888-411-0038
                Email: arosca@prwlegal.com