UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

------------------------------------------------------

                              :

IN RE BIOZOOM, INC. SECURITIES     :
LITIGATION                           :

                              :     CASE NO. 1:14-CV-01087

                              :

                              :     OPINION AND ORDER

                              :     [Resolving Docs. 102, 103]

                              :

------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

In this putative securities class action, Plaintiffs generally seek rescission or damages after the value of Biozoom securities that Plaintiffs had purchased collapsed. Plaintiffs purchased the stock in over-the-counter markets from market makers. Plaintiffs contend the Biozoom securities were unregistered and argue that the Defendant market makers are strictly liable for selling the unregistered stock.

Plaintiffs make claims under Section 12(a)(1) of the Securities Act of 1933 and under a variety of state-law theories. Defendants seek the dismissal of both the federal claims and the state claims. Plaintiffs have responded, and Defendants have replied. The Court has held oral argument on the motions. For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** the motions to dismiss.

## I. Background

### A. Over-the-Counter Bulletin Board Background

Plaintiffs are investors who were victims of a pump-and-dump scheme involving Biozoom, Inc. stock. Pump-and-dump schemes often involve small cap stocks whose value is artificially

Case No. 1:14-CV-01087
Gwin, J.

inflated by false statements to sell the cheaply purchased stock at a higher price.  The schemes typically victimize investors who attempt to quickly profit from recently disclosed "news" on a new and cheap stock.

Plaintiffs sue a number of brokerage firms who acted as market makers for Biozoom in the Over-the-Counter Bulletin Board ("Bulletin Board") and, in that capacity, sold Biozoom stock to Plaintiffs.  To this point, nothing suggests Defendants were aware of the fraudulent scheme to raise Biozoom's stock price or participated in the scheme.  Instead, Defendants were market-makers in Biozoom stock when that stock was sold on the Bulletin Board.[1]

The Financial Industry Regulatory Authority owns the Bulletin Board, which is operated by NASDAQ OMX.[2]  The Bulletin Board is a "regulated quotation service that displays real-time quotes, last-sale prices, and volume information in over-the-counter . . . securities."[3]  Securities transactions on the Bulletin Board are conducted by market makers through a computer system run from New Jersey.[4]

Securities may only be quoted on the Bulletin Board when sponsored by a market maker, and Bulletin Board transactions occur between Bulletin Board members, not retail investors.[5]  Moreover, the securities traded on the Bulletin Board are not traded on any national securities exchange.[6]  Market makers may post quotations that reflect their own buying or selling interest or the unsolicited

---

[1]The list of Defendants is as follows: KCG Americas LLC; Automated Trading Desk Financial Services, LLC; Citigroup Global Markets, Inc.; Citadel Securities LLC; G1 Execution Services, LLC; E-Trade Capital Markets LLC; BTIG, LLC; Canaccord Genuity Inc.; Collins Stewart Inc.; Pershing LLC; Maxim Group LLC; UBS Securities LLC; and VFinance Investments, Inc.

[2]Doc. 62 at 10.

[3]*Id.* at 9.

[4]*Id.* at 9-10.

[5]*Id.* at 10

[6]*Id.* at 9.

Case No. 1:14-CV-01087
Gwin, J.

buying or selling interest of retail customers.[7/]  Plaintiffs say that each of the Defendants served as

a market maker for Biozoom common stock.[8/]

**B. Factual Background**

Plaintiffs' complaint primarily uses the factual background alleged in a related SEC

proceeding.[9/]  Although the background alleged in the SEC action and repeated here is somewhat

involved, the Court recites an abbreviated history of the shares at issue because of that history's

relevance to several of the parties' arguments.

The long and winding road begins on June 25, 2007, with the formation of a Nevada

corporation called Entertainment Art.[10/]  Entertainment Art eventually became Biozoom.

Entertainment Art's stated purpose was to "design, produce, and sell a line of leather bags."[11/]  The

company was controlled by three officers.[12/]

As will be discussed, the Defendants say they are entitled to the dealer's exemption from the

Securities Act's registration requirement because the stock they sold to Plaintiffs had been offered

to the public more than forty days before Plaintiffs purchased their stock.

By March 2008, Entertainment Art had sold 610,000 of its 1,810,000 shares in a series of

private placement transactions.[13/]  On July 18, 2008, Entertainment Art filed a registration statement

for these 610,000 shares with the Securities and Exchange Commission ("SEC").  Defendants argue

---

[7]*See* 17 C.F.R. § 240.15c2-11(f)(2).
[8]Doc. 62 at 10.
[9]*See id.* at 1.
[10]*Id.* at 14.
[11]*Id.*
[12]*Id.*
[13]*Id.*

Case No. 1:14-CV-01087
Gwin, J.

that this 2008 registration and sale began the forty day clock on the dealer's exemption and exempted Defendants from liability for their later sale of unregistered securities.

The next twist came on May 1, 2009, when Entertainment Art was sold in a private transaction to Medford Financial Ltd. ("Medford").[14] Medford held all 1,810,000 shares of Entertainment Art. After a 33:1 split on July 21, 2009, Medford owned all 59,730,000 shares of Entertainment Art.

Entertainment Art was apparently dormant for over three years. Then, on October 25, 2012, Medford sold Entertainment Art to Le Mond Capital ("Le Mond") in a private transaction.[15]

Several months later, and arguably to facilitate a stock fraud scheme, Entertainment Art seemingly morphed into a different entity. First, on March 12, 2013, it announced that it would no longer focus on leather bags, but instead would transition to biotechnology.[16] Concurrently, Entertainment Art announced that a newly formed subsidiary, Biozoom Technologies, Inc., had acquired patents, licenses, and related assets in exchange for shares of Entertainment Art stock.[17]

Le Mond retained the 20,130,000 shares corresponding to the shares mentioned in the 2008 registration statement.

On April 1, 2013, Entertainment Art changed its name to Biozoom.[18]

Between January 2013 and June 2013, ten Argentinian citizens acquired these 20,130,000

---

[14]*Id.* at 15. A notice publicly filed with the SEC indicated that Medford was purchasing the other 1,200,000 shares from Entertainment Art's officers, but did not mention that Medford was also acquiring the 610,000 shares covered by the registration statement. *Id.*

[15]*Id.* Again, the transaction was mentioned in a publicly filed notice with the SEC, but only in part. In particular, the notice said that Le Mond had purchased only about two-thirds of Entertainment Art's shares. In fact, Le Mond had purchased all of the Entertainment Art shares. *Id.*

[16]*Id.* at 16.

[17]*Id.*

[18]*Id.* at 17.

-4-

Case No. 1:14-CV-01087
Gwin, J.

shares from Le Mond and deposited them with two broker-dealers (not the Defendants).[19]

Plaintiffs say that on May 16, 2013, Biozoom shares were quoted on the Bulletin Board for the first time.[20]  Defendants respond that Biozoom shares had been earlier quoted in 2009 on the Bulletin Board.  Shortly thereafter, Biozoom issued a number of press releases claiming to have made a scientific breakthrough.[21]  These claims were picked up and repeated by others.[22]

Over approximately the next month the Argentinian citizens sold 14,078,406 shares of Biozoom stock over the Bulletin Board.[23]  On June 25, 2013, the SEC suspended trading in Biozoom shares.[24]

For their claim against the Defendant market makers, Plaintiffs allege that the Defendants sold shares that were unregistered in violation of Section 12(a)(1) of the Securities Act of 1933.  Plaintiffs also allege that the Defendants impermissibly sold, offered, and delivered unregistered securities "until the delivery of the last shares they sold on June 24, 2013, which delivery took place, upon information and belief, on June 27, 2013."[25]  Plaintiffs also allege a variety of state-law causes of action arising from the same conduct.

**C. Procedural Background**

As discussed below, Defendants make several arguments why this case should be dismissed, including an argument that the statute of limitations should stop this lawsuit.

---

[19]*Id.*

[20]*Id.* at 18.

[21]*Id.*

[22]*Id.*

[23]*Id.* at 18-19.

[24]*Id.* at 19.

[25]*Id.* at 20.

Case No. 1:14-CV-01087
Gwin, J.

On May 20, 2014, Charles Corso, acting as trustee for the Anthony O. Corso Living Trust, ("Corso") filed this putative class lawsuit against Defendant KCG Americas LLC ("KCG"). Corso sought to represent a class of "all persons who purchased Biozoom stock between May 16, 2013[,] and June 25, 2013[,] from Defendant, inclusive, . . . seeking to pursue remedies under the Securities Act [of 1933]."[26]

On June 24, 2014, Plaintiffs filed an amended complaint, adding several more plaintiffs and adding all other Defendants except for VFinance.[27] In their first amended complaint, the Plaintiffs again made a single claim for violation of the Securities Act of 1933.[28]

On September 18, 2014, Plaintiffs filed a Second Amended Complaint, adding two new plaintiffs and Defendant VFinance Investments, Inc.[29] The Second Amended Complaint also added a variety of state law claims.[30]

The Defendants have now filed consolidated motions to dismiss Plaintiffs' federal and state

---

[26]Doc. 1 at 2-3.

[27]Doc. 6. The First Amended Complaint also added John Doe Defendants, which Plaintiffs explained as follows: "Defendants John Does 1 through 12 are the Market Maker entities that sold Plaintiffs and the Class their shares of Biozoom. Plaintiffs have exercised their diligence to determine the exact identities and corporate names of the Market Makers to which their trades were directed that are named as Defendants above. Plaintiffs' diligence consisted of repeated requests to Plaintiffs' stock brokers and brokerage firms, and the investigation of counsel, including a review of FINRA records, OTCBB records, EDGAR database filings and public records searches. Plaintiffs identified the Market Makers' corporate entities to the best extent and most precision possible, but are naming [the John Doe Defendants] as defendants to the extent discovery shows that different corporate entities related to the named Defendants are the actual Market Makers." *Id.* at 8.

[28]Doc. 6.

[29]Doc. 62. The Second Amended Complaint also dropped the John Doe Defendants and added another Defendant, Archipelago Trading Services, Inc., *id.*, but the claims against that defendant were subsequently voluntarily dismissed, Docs. 89, 95.

[30]Doc. 62.

Case No. 1:14-CV-01087
Gwin, J.

law claims.[31]  Plaintiffs have opposed these motions,[32] and Defendants have replied.[33]  After

obtaining leave from the Court, Plaintiffs have filed a brief sur-reply.[34]

## II. Law and Analysis

### A. Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'"[35]  The plausibility requirement is not

"akin to a probability requirement," but requires "more than a sheer possibility that the defendant

has acted unlawfully."[36]

Federal Rule of Civil Procedure 8 provides the general standard of pleading and only requires

that a complaint "contain . . . a short and plain statement of the claim showing that the pleader is

entitled to relief."[37]  "Rule 8 marks a notable and generous departure from the hyper-technical,

code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff

armed with nothing more than conclusions."[38]  In deciding a motion to dismiss under Rule 12(b)(6),

"a court should assume the[] veracity" of "well-pleaded factual allegations."[39]

### B. Securities Act Claim

The Securities Act of 1933 rejected merit review and instead opted for full disclosure through

---

[31]Docs. 102, 103.

[32]Docs. 115, 116.

[33]Docs. 117, 118.

[34]Doc. 120.

[35]*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[36]*Id.*

[37]Fed. R. Civ. P. 8(a)(2).

[38]*Iqbal*, 556 U.S. at 678-79 (citations omitted).

[39]*Id.*

Case No. 1:14-CV-01087
Gwin, J.

registration with the SEC.[40]  In general, Section 12(a)(1) of the Securities Act of 1933 prohibits the offer or sale of an unregistered security.[41]

**1. Statute of Limitations**

Defendants first say that the statute of limitations defeats all of Plaintiffs' claims under Section 12(a)(1) of the Securities Act of 1933 for distributing unregistered securities except those brought by original Plaintiff Corso against Defendant KCG.  A Section 12(a)(1) claim must be brought "within one year after the violation upon which it is based."[42]  Plaintiffs respond that the claims were timely against all Defendants other than VFinance, and that the claims against all Defendants are timely because they relate back to the filing of the original complaint.

In a claim for a Section 12(a)(1) violation, compliance with the statute of limitations must be affirmatively pleaded.[43]

**a. Timely Filed**

Plaintiffs first say that two questions arise in the present case.  First, is the "violation upon which [the claim] is based" the sale at issue, or can the delivery count as well?  And second, if a defendant continues to offer the unregistered security for sale after the completion of the sale to the respective plaintiffs, does the violation continue such that the statute of limitations does not begin to run until the defendant stops offering the security for sale?  In arguing for a more forgiving statute of limitations, Plaintiffs say that the date of delivery can count as well as the date of sale, and further that an offer is a continuing violation.  Unsurprisingly, Defendants disagree with both contentions.

---

[40] 1 Louis Loss et al. Securities Regulation 343 (5th ed. 2014).

[41] *See* 15 U.S.C. §§ 77*l*, 77e.

[42] *Id.* § 77m.

[43] *See, e.g.*, *Toombs v. Leone*, 777 F.2d 465, 468 (9th Cir. 1985).

Case No. 1:14-CV-01087
Gwin, J.

The Court need not resolve the first question in the abstract.  Rather, the Court notes that the Plaintiffs have not alleged the delivery date for any particular sale.  Indeed, the Plaintiffs only say that "on information and belief," the Defendants continued to deliver shares until June 27, 2014, three days after the SEC suspended trading.[44]

In their briefing, Plaintiffs explain the basis for this information and belief.  They rely upon an SEC regulation that requires security purchasers settle all trades within three days after sale.[45] But as Defendants correctly point out, the regulation actually says only that transactions must settle within three days.  The regulation does not say transactions only become effective three days after the trade.[46]

Neither the complaint nor the PSLRA certifications contain any allegations of when delivery of the securities occurred.  Instead, they list only a sale date, with a latest listed date of June 21, 2013.[47]  In their response to Defendants' motion to dismiss, Plaintiffs compute each delivery date as three business days after the sale date.  Factual allegations in a response to a motion to dismiss do not suffice, and, at any rate, these allegations appear to rest solely on a mistaken understanding of SEC regulations.  Accordingly, the Court need not decide whether, in the abstract, the delivery of a security occurring after the sale resets the one year clock.

Plaintiffs next argue that because Section 12(a)(1) prohibits not only the sale of unregistered securities, but also the offer for sale of unregistered securities, Defendants engaged in a continuing violation by offering to sell unregistered Biozoom securities until the SEC halted trading in the stock

---

[44]Doc. 62 at 20.

[45]Doc. 115 at 8 (citing 17 C.F.R § 240.15c6-1).

[46]17 C.F.R. § 240.15c6-1.  Plaintiff also cites an SEC press release, which further confirms that the regulation requires only that the transaction settles no later than three days after the sale.  *About Settling Trades in Three Days: Introducing T+3*, SEC, http://www.sec.gov/investor/pubs/tplus3.htm.

[47]Doc. 6-1.

Case No. 1:14-CV-01087
Gwin, J.

on June 25, 2013.

Recall that the Defendants were sued on three different dates.  On May 20, 2014, Plaintiff Corso sued Defendant KCG in his initial complaint.[48/]  Then, in their First Amended Complaint on June 24, 2014, Plaintiffs added the remaining Defendants other than VFinance.[49/]  And on September 18, 2014, Plaintiffs added allegations against VFinance.[50/]  Plaintiffs' complaint alleges no sale after June 21, 2013.  For Corso, it alleges a latest sale of June 19, 2013, and an earliest sale of June 18, 2013.[51/]

If Plaintiffs are correct that a continuing violation occurred for statute of limitations purposes until June 25, 2013,[52/] then the allegations against all Defendants except VFinance were timely brought.  By contrast, if Defendants are right that each sale must be viewed as a separate violation, then only Corso timely brought his Section 12(a)(1) claim.

The Court concludes that Defendants have the better of this argument.  The governing statute of limitations is explicit that claims must be brought within one year of "the violation upon which it is based."[53/]  And in *Pinter v. Dahl*, the Supreme Court construed Section 12(a)(1) as requiring some nexus with an actual sale.  In particular, although an offer or solicitation can support liability even against one who was not the actual seller, "a prospective buyer has no recourse against a person who touts unregistered securities to him if he does not purchase the securities."[54/]

---

[48]Doc. 1.

[49]Doc. 6.

[50]Doc. 62.

[51]Doc. 6-1 at 1.

[52]Plaintiffs also generally allege that Defendants continued to settle sales until June 27, 2013, three days after the halt of trading.  Because there is no functional difference between the statute of limitations beginning on June 25, 2013, and June 27, 2013, the Court considers these arguments together.

[53]15 U.S.C. § 77m.

[54]*Pinter v. Dahl*, 486 U.S. 622, 644 (1988).

Case No. 1:14-CV-01087
Gwin, J.

It follows that the violation occurs when a prospective buyer actually purchases the securities. Where, as here, plaintiffs allege that defendants sold securities to them, and then continued to promote or offer afterwards, the violation occurs at the time of the sale. Subsequent offers or solicitations could support an additional claim, but until a further sale takes place based on them, no later violation has occurred.

Both parties suggest that *Cummings v. Paramount Partners, LP* supports their position.[55] On the Plaintiffs' side, the *Cummings* court did say that "[i]t is possible that conduct that Plaintiffs characterize as 'continued solicitation' could be the type of conduct that would constitute an alleged violation."[56] It also acknowledged that "[c]ourts have indicated that if the last conduct to have occurred that gives rise to the liability under section 12(a)(1) is the 'offer' of an unregistered security, the one-year limitations period would begin to run from the offer."[57]

But the court then went on to note that there was no allegation that the Defendants had made such offers to the Plaintiffs after the dates of the sales. Moreover, in *Cummings*, the court said, "Plaintiffs have provided no support, and this Court can find none, for the proposition that the limitations period continues beyond one year for the completed purchase of an unregistered security when a defendant later offers to sell the same individual a separate unregistered security."[58] This conclusion is in harmony with the most natural reading of the phrase "violation upon which it is based" in the statute of limitations.

Nor do the other cases cited by Plaintiffs support Plaintiffs' position. In one, the court treated

---

[55] 715 F. Supp. 2d 880 (D. Minn. 2010).
[56] *Id.* at 895.
[57] *Id.* (internal citation omitted).
[58] *Id.* at 896.

-11-

Case No. 1:14-CV-01087
Gwin, J.

the statute of limitations as running from the delivery of the particular security sold to plaintiffs.[59/]

In another, Plaintiffs are correct that the court "examine[d] the dispute with an eye towards any set

of facts which could support the plaintiffs' claim."[60/]  But in doing so, the court looked to the actual

date of sale, not to any continued offer.[61/]  And the third case that Plaintiffs rely upon addressed a

different theory for when the statute of repose began running, not the Plaintiffs' continuing offer

theory as to the statute of limitations.[62/]

### b. Relation Back

Alternative to their argument that the statute of limitations only begins running for claims

of selling unregistered securities when a Defendant stops offering the security, Plaintiffs contend that

all their claims against Defendants sued in the amended complaints relate back to the filing of the

original complaint.[63/]

Federal Rule of Civil Procedure 15(c) gives the standard for deciding if a late filed claim can

relate back to an earlier complaint.  For a claim against a new defendant to relate back, three

requirements must be met.

First, the claim against the new defendant must arise "out of the conduct, transaction, or

---

[59]*Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1064 (D. Minn. 2003).

[60]*Snyder v. Newhard, Cook & Co.* 764 F. Supp. 612, 618 (D. Colo. 1991).

[61]*Id.*

[62]*Booth v. Strategic Realty Trust, Inc.*, No. 13-cv-04921, 2014 WL 3749759, at *7-8 (N.D. Cal. July 29, 2014).  At oral argument, Plaintiffs cited two new cases to support their argument that all steps of an illegal distribution are part of the same transaction.  *See SEC v. Kern*, 425 F.3d 143 (2d. Cir. 2005); *SEC v. Simmons*, No. 8:04-cv-2477, 2008 WL 7935266 (M.D. Fla. Apr. 25, 2008).  These cases, *Kern* and *Simmons*, deal not with when a violation occurs for statute of limitations purposes, but with the definition of transaction within exemption 4(a)(1), not at issue in this case.  Moreover, these cases dealt with that question in the context of parties found to be statutory underwriters.  Plaintiffs have not alleged that Defendants in this case are underwriters.

[63]Doc. 115 at 11-18.

-12-

Case No. 1:14-CV-01087
Gwin, J.

occurrence set out–or attempted to be set out–in the original pleading."[64]  Second, "within the time

period provided by Rule 4(m) for serving the summons and complaint," the party being added must

have "received such notice of the action that it will not be prejudiced in defending on the merits."[65]

And third, within that same time period, it must be the case that the defendant "knew or should have

known that the action would have been brought against it, but for a mistake concerning the proper

party's identity."[66]

Defendants do not claim that they were prejudiced by being joined in the amended

complaints rather than sued the original complaint.  Instead, Defendants challenge whether Plaintiffs

show the new claims arise "out of the conduct, transaction, or occurrence set out" in the original

complaint and whether Plaintiffs show these new Defendants "knew or should have known that the

action would have been brought against it, but for a mistake concerning the proper party's identity."

The Court finds that Plaintiffs do not show the later-added Defendants were omitted from

the original complaint because of a "mistake" as "mistake" should be interpreted under Rule

15(c)(1)(C).  It is therefore unnecessary to consider whether the new claims arise from the same

"conduct, transaction, or occurrence," although the Court notes that Plaintiffs may well have

difficulty making this showing for separate sales between separate parties.

Under Sixth Circuit law, Rule 15(c) only permits the substitution of plaintiffs or defendants,

not the addition of them.[67]  For a time after the Supreme Court's decision in *Krupski v. Costa*

---

[64]Fed. R. Civ. P. 15(c)(1)(B).

[65]*Id.* R. 15(c)(1)(B)-(C)

[66]*Id.*

[67]*Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 318 (6th Cir. 2010).

-13-

Case No. 1:14-CV-01087
Gwin, J.

*Crociere S. p. A.*,[68/] it was unclear whether this rule had been abrogated.[69/]  But the Sixth Circuit has

since reaffirmed the rule, albeit in unpublished decisions.[70/]  The Section 12(a)(1) claims against the

later-added Defendants thus cannot relate back because they involve adding both new Defendants

and new Plaintiffs.

Moreover, even without the Sixth Circuit's categorical rule, relation back would be

inappropriate in this case.  The original complaint stated that it was "a securities class action on

behalf of persons or entities who purchased the common stock of Biozoom from defendant [KCG]

on the [Bulletin Board] . . . ."[71/]  The original complaint nowhere mentions any of the later-added

defendants.[72/]  Nor were any of the Plaintiffs who now assert claims against the later-added

Defendants included in the original complaint in any way.[73/]  No complaint allegation suggests the

added plaintiffs share any community of interest with Corso apart from both making similar claims

against Biozoom market makers.

It is difficult to see how Corso, the only Plaintiff in the original complaint, could have made

a mistake by failing to sue parties he has no claim against.  And while the later-added Plaintiffs may

have made a mistake, that mistake was in failing to make their claims before the limitations period

ran, not a "mistake concerning the proper party's identity."[74/]

---

[68]560 U.S. 538 (2010).

[69]*See, e.g.*, *Erie Indem. Co. v. Keurig, Inc.*, No. 1:10-cv-02899, 2011 WL 2893013, at *3 (N.D. Ohio July 15, 2011).

[70]*See* *Smith v. City of Akron*, 476 F. App'x 67, 69 (6th Cir. 2012) ("Smith adds that [*Krupski*] requires us to alter our interpretation of Rule 15(c).  Not so.").

[71]Doc. 1 at 2.

[72]*See* Doc. 1.

[73]*Id.*

[74]*Cf.* 6ACharles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1501 (3d ed.) ("[A]n amendment that seeks to add a new plaintiff who asserts an entirely different claim will not relate back." (citing *Asher v. Unarco* as well as cases from other jurisdictions, including some decided after *Krupski*).

Case No. 1:14-CV-01087
Gwin, J.

* * *

For the reasons stated above, the later-added Plaintiffs' Section 12(a)(1) claims against the later-added Defendants are time barred.  They were brought outside the one year statute of limitations, and they do not relate back to the filing of the original complaint.  The Court will therefore **GRANT** the later-added Defendants' motion to dismiss these claims.

**2. Statutory Seller**

In addition to their statute of limitations defense, Defendants raise a variety of substantive arguments for the dismissal of Plaintiffs' Section 12(a)(1) claims.  Although the Court has concluded that only Plaintiff Corso's claim survives the statute of limitations, the analysis of these substantive arguments would be identical for all Plaintiffs and Defendants.  For simplicity, therefore, the Court refers to "Defendants" and "Plaintiffs" rather than simply to Plaintiff Corso and Defendant KCG.

Defendants argue that Plaintiffs' claims fail because Plaintiffs inadequately alleged that Defendants were sellers within meaning of Section 12(a)(1).  In support, Defendants generally say the Bulletin Board only allows sales between members and does not allow sales to non-members.  As a result, the Defendants say, they were not sellers in Plaintiffs' transactions.  Defendants say the Plaintiffs must have purchased their shares of Biozoom from their own brokers, not from the Defendants.  Plaintiffs generally respond that they purchased the shares through, not from, their own brokers, who, the Plaintiffs say, were acting as the Plaintiffs' agents.

Section 12(a)(1) liability does not attach to remote sellers.[75]  Therefore, it matters whether the Plaintiffs have adequately alleged that they purchased directly from the Defendants.  For the reasons below, the Court agrees with Plaintiffs' argument that they have sufficiently alleged direct

---

[75] *Pinter v. Dahl*, 486 U.S. 622, 644 n.21 (1988).

Case No. 1:14-CV-01087
Gwin, J.

purchases to survive a motion to dismiss.

The complaint acknowledges that only members may conduct purchases on the Bulletin Board.[76/] Plaintiffs appear to concede that none of the Plaintiffs are Bulletin Board members and that the Plaintiffs acquired their shares with the assistance of their brokers, who were Bulletin Board members.[77/]  The complaint alleges that Plaintiffs directly purchased the Biozoom shares in question.[78/]  If Plaintiffs purchased the shares, they must have purchased them from somebody.  But from their own brokers or from Defendants?  Answering that question resolves this issue.[79/]

Traditional notions of the broker-client relationship are instructive here.  The Securities Exchange Act of 1934 defines broker as "any person engaged in the business of effecting transactions in securities for the account of another.[80/]  And although this definition is limited to the Securities Exchange Act,[81/] it is consistent with the typical meaning of "broker."

*Black's Law Dictionary* defines "broker" in the securities context as "[a] person engaged in the business of conducting securities transactions for the accounts of others."[82/]  And it further explains that "[t]he most important determining factor of what constitutes a 'broker' is whether the party is dealing for itself or for another.  A broker may, by contract, have title to property pass through it (though usually it does not), and it may, by contract, collect from the consumer, but a

---

[76]Doc. 62 at 9-10.

[77]Doc. 115 at 1, 19-20.

[78]Doc. 62.

[79]Plaintiffs argue that the allegation of a direct purchase is factual and must be accepted at the motion to dismiss stage.  Doc. 115 at 19.  The Court disagrees.  In this context, the allegation of a direct purchase is a legal conclusion, and, moreover, is plausible only if a purchase with the assistance of a broker can be direct.

[80]15 U.S.C. § 78c(a)(4).

[81]Id. § 78c(a).

[82]Black's Law Dictionary 205 (8th ed. 2004).

-16-

Case No. 1:14-CV-01087
Gwin, J.

broker does not deal on its account."[83/]  Critically, as one commentator has explained, "[a]gency principles apply in determining who is a purchaser for purposes of section 12. Thus, when an agent purchases securities for the account of the principal, the principal as the real party in interest should be able to bring suit under section 12."[84/]

The Court concludes that Plaintiffs sufficiently allege that Plaintiffs were the real parties in interest and acting though brokers in the transactions.  Where brokers act as agents of their clients, the client remains the purchaser, regardless of whether title formally passes through the broker.

Of course, broker-dealers sometimes make trades for their own accounts rather than as their clients' agents.  In cases where a broker-dealer purchases an unregistered security for the broker-dealer's own account, and then later sells the security to a client, the client would not have a claim against the entity that sold the security to the broker-dealer.

At this stage of the proceeding, Plaintiffs have adequately pled that Defendants acted as statutory sellers.  In particular, the allegation that Plaintiffs purchased Biozoom shares through a broker states a plausible claim.  For example, if Plaintiffs' brokers paid for the Biozoom shares with funds drawn on Plaintiffs' accounts and immediately deposited or credited the shares in Plaintiffs' accounts, then the Defendants could be statutory sellers for purposes of the statute even though Plaintiffs' brokers were the nominal counterparties in the Bulletin Board transactions.

Defendants argue that Plaintiffs were required to expressly mention the agency relationship with their brokers in the complaint.  But Federal Rule of Civil Procedure 8 does not require magic words.  Particularly against the backdrop of the usual agency relationship between brokers and

---

[83]*Id.*

[84]Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 7.2[1][A] (last updated Jan. 2015).

Case No. 1:14-CV-01087
Gwin, J.

clients, Plaintiffs' allegations relating to their brokers gave Defendants sufficient notice of the claimed theory of liability.

The cases cited by Defendants are not to the contrary. In these cases, in order to hold defendants liable as principals for the acts of their alleged agents, plaintiffs had to plead specific facts that, if proved, would support a conclusion of agency.[85/] By contrast, here the alleged agency relationship merely provides the factual explanation for how the transaction in question occurred rather than the legal justification for the liability. Moreover, the agency relationship alleged in at least one of the cases Defendants cite appeared much less plausible than the broker/client relationship suggested by Plaintiffs here.[86/]

### 3. Dealer Exemption

Defendants next claim that Section 4(a)(3) of the Securities Act of 1933 shields them from liability for selling unregistered Biozoom shares. The dealer exemption flows from the 1933 Securities Act's focus on distributions and underwriting, not on trading.[87/]

The dealer exemption generally exempts "transactions by a dealer (including an underwriter no longer acting as an underwriter in respect of the security involved in such transaction)" from the Securities Act's registration requirements.[88/] But this exemption from the registration requirement

---

[85/]*See Midkiff v. Adams Reg'l Water Dist.*, 409 F.3d 758 (6th Cir. 2005); *Issa v. Provident Funding Grp., Inc.*, 09-12595, 2010 WL 538298, at *4 (E.D. Mich. Feb. 10, 2010).

[86/]*See Midkiff*, 409 F.3d at 767 ("The Midkiffs' argument expands agency theory nearly to the breaking point by equating the contractual relationship between the Water District and the customer/property owner with an agency relationship.").
Because the Section 12(a)(1) claims of all Plaintiffs except Corso fail on statute of limitations grounds, the above statutory seller analysis applies directly only to Corso's claim. If the statute of limitations did not defeat the other Plaintiffs' Section 12(a)(1) claims, the statutory seller analysis would apply identically to the other Plaintiffs' Section 12(a)(1) claims.

[87/]See 1 Louis Loss et al. Securities Regulation 343 (5th ed. 2014) ("This Act is concerned by and large with the initial distribution of securities rather than with their subsequent trading.").

[88/]15 U.S.C. § 77d(a)(3).

Case No. 1:14-CV-01087
Gwin, J.

has limits to help ensure that dealer underwriting does not escape the registration requirements.

Most relevant here, Section 4(a)(3)(A) says that dealers can be liable for "transactions taking place prior to the expiration of forty days after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter."[89] Defendants bear the burden of establishing exemption from the registration requirement.[90]

The parties do not dispute that Defendants are dealers for purposes of the exemption. They sharply dispute, however, whether Defendants made sales "prior to the expiration of forty days after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter."[91]

Defendants say the shares were first bona fide offered to the public when the initial 2008 registration statement was filed and that the forty days has long since passed. Alternatively, the Defendants argue that Biozoom shares (then still Entertainment Art shares) were traded on the Bulletin Board in 2009.

Plaintiffs respond that the 2008 registration is irrelevant because each new distribution must be separately registered and each new distribution begins a new forty day period when dealers are subject to liability. The Plaintiffs claim the 2013 pump-and-dump scheme was a new distribution of Biozoom shares not covered by the 2008 registration statement. Accordingly, Plaintiffs say, Biozoom shares were first "bona fide offered to the public" on the first date they appeared on the Bulletin Board following this new distribution.

---

[89] Id. § 77d(a)(3)(A).

[90] *See, e.g., SEC v. Cavanagh, 445 F.3d 105, 111 n.13 (2d Cir. 2006)* ("[T]he defendant bears the burden of proving the applicability of an exemption." (citing *SEC v. Ralston Purina Co., 346 U.S. 119, 126 (1953)*)).

[91] *Id.*

Case No. 1:14-CV-01087
Gwin, J.

As earlier described, Defendants offer evidence that Biozoom was quoted in 2009 on the Bulletin Board. Responding to this argument, Plaintiffs say that sales on the Bulletin Board prior to this new 2013 distribution would be irrelevant and argue that the documents Defendants offer to establish these earlier 2009 quotations are not proper subjects of judicial notice.

In deciding whether the 2013 sales fall outside the dealer exemption because they arguably occurred within 40 days of the first bona fide offer, the Court must first resolve whether "first date upon which the security was bona fide offered to the public" refers to any bona fide offer of the security to the public, or only a bona fide offer made during or after the 2013 unregistered distribution at issue in this case.

Defendants have the better reading of the statute. The statute refers to the "first date" when the security was "bona fide offered to the public."[92] The statute gives no indication that this time period resets every time there is a new distribution of the security in question. It speaks neither in terms of when the unlawful distribution began nor in terms of any particular offering or transaction. Rather, by its own terms, the statute runs this time period once, from the "*first* date when the security was "bona fide offered to the public."[93]

Although the Plaintiffs cite several cases and claim the cases support their argument that the forty day clock restarts with each new distribution, none persuade. Some of the cases rest liability on a dealer's distribution activity, which Section 4(a)(3)(C) separately excepts from the dealer exemption.[94] Others merely say that registration attaches transaction by transaction rather than

---

[92]*Id.*

[93]*Id.* (emphasis added).

[94]*See, e.g.*, *SEC v. N. Am. Research & Dev. Corp.*, 424 F.2d 63, 72 (2d Cir. 1970).

Case No. 1:14-CV-01087
Gwin, J.

security by security.[95] This is an important distinction, and it explains why the 2008 S-1 registration does not satisfy the Securities Act's registration requirements. But it does not speak to the question of how to interpret the statutory exemption from the registration requirement found in Section 4(a)(3).

There is one case Plaintiffs cite that contains language and analysis suggesting that a new distribution restarts the forty day clock. Specifically, in *SEC v. North American Research & Development Corp.*, the district court reasoned that "[t]he purpose of the 40-day requirement was to prevent dealers from even unknowingly taking part in a distribution during that period."[96] And, the court continued, "[t]hat purpose is effectuated by requiring that dealers make certain that the shares traded by them do not emanate from a controlling person who has made a public offering in the United States within the 40-day period prior to the time of the dealer's transaction."[97]

Relying on this reasoning, the court held that even though the securities at issue had been available to the public for many years prior to the unregistered distribution at issue, the forty day period did not start until the first bona fide public offer of the securities from the tainted distribution.[98] Thus, at first glance, this case supports Plaintiffs' position in this case.

Upon closer inspection, however, *North American Research & Development* cannot bear much weight. First, the district court expressly limited its holding to circumstances not present here. In *North American Research & Development*, the initial distribution occurred before the 1933

---

[95]*See, e.g.*, *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998) ("Each sale of a security, then, must either be made pursuant to a registration statement or fall under a registration exemption." (internal quotation marks and citations omitted)).

[96]*SEC v. N. Am. Research & Dev. Corp.*, 280 F. Supp. 106, 125 (S.D.N.Y. 1968), *vacated in part on other grounds*, 424 F.2d 62 (2d Cir. 1970).

[97]*Id.*

[98]*Id.*

Case No. 1:14-CV-01087
Gwin, J.

Securities Act became effective.  The *North American Research & Development* court emphasized that its  "result is confined to the situation in which the illegal offering by controlling persons is the first public offering of the security occurring after 1933, when the Securities Act went into effect."[99] Because the initial distribution had occurred before 1933, the securities in question had never been registered.  Here, by contrast, a registration statement involving Biozoom (or Entertainment Art) securities had been earlier filed.

Moreover, in reviewing the district court's opinion in *North American Research & Development*, the Second Circuit upheld liability for the registration failure on the separate grounds that the defendants participated in the unlawful subsequent distribution.[100]   By contrast, the Defendants in this case did not participate in distribution.[101]

Various commentators interpret the district court's decision in *North American Research & Development* as correctly finding a Congressional intent to begin a new forty day period running whenever a new illegal distribution occurs.[102]   And the legislative history of the Securities Act of 1933 provides some support for this view as well.[103]   Finally, although the *North American Research & Development* court expressly limited its holding to cases where no public offering had occurred

---

[99]*Id.* at 125 n.18.

[100]*See, e.g.*, *SEC v. N. Am. Research & Dev. Corp.*, 424 F.2d 63, 72 (2d Cir. 1970).

[101]Likewise, this lack of distribution distinguishes the Defendants in this case from those in the SEC proceedings related to Biozoom stock.  *See SEC v. Tavella*, ___ F. Supp. 3d ___, 2015 WL 72817, at *8 (S.D.N.Y. Jan. 15, 2015).

[102]*See, e.g.*, 7B J. William Hicks, Exempted Transactions Under the Securities Act of 1933 § 12.16 (last updated Dec. 2014) ("[T]he date of an issuer's initial public offering of securities is inappropriate for [Section 4(a)(3)(A)] since the purpose of the 40-day requirement is to keep dealers out of all illegal distributions throughout an issuer's financial life.");  1 Louis Loss et al. Securities Regulation 704 (5th ed. 2014) (citing *North American Research & Development Corp.*, 280 F. Supp. at 121, 125 (S.D.N.Y. 1968)).

[103]*See* H.R. Rep. No. 85, at 6 (1933) ("The exemption sections . . . exempt, among other transactions in securities . . . transactions by a dealer in securities not connected by time or circumstance with distribution of a *new offering* . . . ." (emphasis added)).

-22-

Case No. 1:14-CV-01087
Gwin, J.

after the Securities Act of 1933 went into effect,[104/] it is unclear why securities formerly offered to the public under a registration statement would be treated any differently.

Nonetheless, the Court is not controlled by the *North American Research & Development* decision and does not find its (or the commentators') interpretation of Section 4(a)(3)(A) persuasive.

Plaintiffs are correct that a new distribution requires either a new registration statement or a new exemption from registration. But that neither makes the security itself new nor makes a subsequent bona fide offer the first bona fide offer.

Finally, the 1933 Securities Act originally included language preventing a different exemption from applying to cases following future distributions.[105/] The fact that Congress did not similarly stop the dealer exemption for future distributions suggests that Congress did not intend to restart the 40 day period to qualify for the dealer's exemption.

But Defendants push the argument too far when they contend that a registration statement is always the date the security is bona fide offered to the public. While the Sixth Circuit has not ruled on the issue, the Court adopts the reasoning of *P. Stolz Family Partnership L.P. v. Baum*.[106/] In that case, the Second Circuit concluded that the underlying test was "the genuineness of the offering to the public." The filing of a registration statement, then, is evidence of a bona fide offer to the public, but is not conclusive.[107/] In other words, "the relevant question . . . is when was the

---

[104]*N. Am. Research & Dev.*, 280 F. Supp. at 125 n.18.

[105]Securities Act of 1933 Sec. 3(a), ch. 38, 48 Stat. 74, 76 (1933) (granting a registration exemption to "[a]ny security which, prior to or within sixty days after the enactment of this title, has been sold or disposed of by the issuer or bona fide offered to the public, *but this exemption shall not apply to any new offering of any such security by an issuer or underwriter subsequent to such sixty days*" (emphasis added)).

[106]355 F.3d 92 (2d Cir. 2004).

[107]*P Stolz* dealt with the triggering date for the three year statute of repose for Section 12(a)(1) claims, which also begins running when the security is "bona fide offered to the public" 15 U.S.C. § 77m. But in doing so, the *P Stolz* court relied in part in cases interpreting the language in the dealer's exemption. *P Stolz*, 355 F.3d at 99.

Case No. 1:14-CV-01087
Gwin, J.

stock really and truly (genuinely) being offered to the public, as opposed to, say, a simulated offering."[108/]

At this stage, the Court is unable to conclude that Defendants have met their burden of establishing eligibility for the dealer's exemption from registration.  Although an Entertainment Art stock Form S-1 was filed on July 18, 2008, issues remain whether Biozoom (or Entertainment Art) shares were "really and truly (genuinely) . . . offered to the public" at that time.

The complaint alleges a series of transactions following the registration statement that may not have involved the public.  First, the complaint alleges that before the registration was filed, about one third of the Entertainment Art shares were distributed in "private placement transactions."[109/] Then, the complaint says that on May 1, 2009, after the registration statement had been filed, these shares along with those still held by Entertainment Art officers were all sold to Medford Financial Ltd.[110/] And while the alleged path of the shares to the Argentinian shareholders is long and winding, the complaint itself gives no indication that it included an offer to the public at any point prior to May 16, 2013.[111/]

Defendants contend that the forty day period has expired even if it began running on the first date the securities were posted on the Bulletin Board.  In support, they point to Market Maker Price Movement Reports. Defendants say that the Court should consider these documents, which they say show that Biozoom (then Entertainment Art) shares were quoted on the Bulletin Board in 2009, well more than forty days before the transactions at issue in this case.

---

[108]*P Stolz*, 355 F.3d at 99.  The Court thus rejects contrary cases holding that a bona fide public offering occurs whenever a registration statement is filed. *See, e.g.*, *Morse v. Peat, Marwick, Mitchell & Co.*, 445 F. Supp. 619, 622 (S.D.N.Y. 1977).

[109]Doc. 62 at 14.

[110]*Id.* at 15.

[111]*Id.* at 15-18.

-24-

Case No. 1:14-CV-01087
Gwin, J.

In attempting to lay a foundation that these documents should be considered in a Rule 12(b)(6) motion to dismiss, Defendants first argue that these documents should be considered because "Plaintiffs implicitly reference [them] by discussing the quoting of Biozoom, and because these documents refute Plaintiffs' claim that Biozoom was first quoted in May 2013."[112] The Court disagrees. The complaint does not reference these documents, implicitly or otherwise. And although Sixth Circuit case law provides for the consideration of public documents that refute a complaint's allegations,[113] the document Defendants rely upon is not public.

Defendants also note in the affidavit to which the Market Maker Price Movement Reports are attached that "[c]ourts have previously taken judicial notice of reports reflecting the stock price, quoting, and trading of securities, including securities listed on the [Bulletin Board]."[114] But judicial notice is only proper for "facts which are not subject to reasonable dispute."[115]

As Plaintiffs point out, that is not the case here. The documents in question are no longer available from the Bulletin Board's website, and the website can no longer be accessed at all. Moreover, the reports themselves contain disclaimers of liability for any information "because of the possibility of human and mechanical errors as well as other factors."[116] Although Defendants may well be able to later establish the accuracy of these reports, perhaps by providing the other sources

---

[112]Doc. 118 at 15 n.26.

[113]*See In re Omnicare Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014) ("[W]e have recognized that if a plaintiff references or quotes certain documents, or if *public records* refute a plaintiff's claim, a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment." (emphasis added)).

[114]Doc. 118-1 at 1.

[115]*Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005); *see also* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact *that is not subject to reasonable dispute* because it . . . can be accurately and readily determined from sources *whose accuracy cannot reasonably be questioned*." (emphasis added)).

[116]Doc. 118-1.

-25-

Case No. 1:14-CV-01087
Gwin, J.

they mentioned at oral argument,[117] whether Biozoom was offered on the Bulletin Board in 2009 is not so clearly undisputed as to permit judicial notice at the motion to dismiss stage.

Accordingly, the Court concludes that Defendants have not established their entitlement to dismissal of Plaintiffs' Section 12(a)(1) claims on the basis of the dealer's exemption found in Section 4(a)(3).[118]

### 4. Brokers' Transaction Exemption

Finally, Defendants argue that their Biozoom sales are exempt from registration under the brokers' transaction exemption. This exemption, found at Section 4(a)(4) of the Securities Act, protects "brokers' transactions executed upon customers' orders on any exchange or in the over-the-counter market but not the solicitation of such orders."[119] As noted above, the burden of establishing entitlement to an exemption rests with the party claiming it.[120]

Defendants generally argue that facts alleged in the complaint demonstrate each of the four required elements of the exemption.[121] First, they say that the complaint's reference to them as "broker-dealers" establishes that they are brokers and that the transactions are thus brokers' transactions. Second, they say that the transactions were executed at the request of the Plaintiffs' retail brokers and that Plaintiffs' brokers were Defendants' customers for purposes of Section

---

[117]*See* Doc. 125 at 38.

[118]For the same reasons, Plaintiffs' complaint plausibly alleges that the three year statute of repose, which runs for three years after a bona fide offer to the public, *see* 15 U.S.C. § 77m, has not expired.
　　Because the Section 12(a)(1) claims of all Plaintiffs except Corso fail on statute of limitations grounds, the above dealer exemption analysis applies directly only to Corso's claim. If the statute of limitations did not defeat the other Plaintiffs' Section 12(a)(1) claims, the dealer exemption analysis would apply identically to the other Plaintiffs' Section 12(a)(1) claims.

[119]15 U.S.C. § 77d(a)(4).

[120]*See, e.g., SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006) ("[T]he defendant bears the burden of proving the applicability of an exemption." (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953))).

[121]*See* Doc. 102-1 at 19-20.

Case No. 1:14-CV-01087
Gwin, J.

4(a)(4).  Third, Defendants say that the transactions were made on the Bulletin Board, an over-the-counter market.  And fourth, Defendants say that the mere posting of bid and ask quotations on the Bulletin Board does not constitute solicitation.

Defendants falter on the first element of the exemption.  The brokers' transaction exemption requires Defendants to show not only that they are brokers, but also that the transactions were "brokers' transactions."  Because the complaint alleges that Defendants participated in the transactions for Defendants' own account, the brokers' transaction exemption may not apply.

By its own terms, the exemption is limited to "brokers' transactions."[122]  Analysis of the scope of this category is made somewhat more difficult by the fact that the Securities Act nowhere defines "broker" or "brokers' transaction."  But as with Defendants' statutory seller argument, the typical meaning of "broker" in similar contexts is instructive.  For similar reasons to those given above, "brokers' transactions" for Section 4(a)(4) purposes are those where brokers execute the transaction for others' accounts rather than for their own.

Defendants argue that this definition is unduly restrictive in the context of the Bulletin Board.  They say that by standing willing to buy and sell securities at quoted prices, market-makers provide liquidity.  In doing so, Defendants say, market makers act as a sort of "broker's broker," executing transactions at the request of their counterparties, who function as their customers for purposes of the brokers' transaction exemption.

In support, Defendants cite various SEC documents for the proposition that market makers can, and often do, act as brokers.[123]  Indeed they can act as brokers and often do act as brokers when

---

[122]15 U.S.C. § 77d(a)(4).

[123]*See* Penny Stock Disclosure Rules, Exchange Act Release No. 29,093, 56 Fed. Reg. 19615, 19193 (Apr. 17, 1991), Proposed Rule 11b-1 Regulating Specialists, Exchange Act Release No. 7,432, 1964 WL 66987 (Sept.

(continued...)

Case No. 1:14-CV-01087
Gwin, J.

buying or selling securities for clients.  But that does not mean that Defendants have shown that they have done so here.  Indeed, one of the SEC documents that Defendants cite undercuts their argument by expressly distinguishing between activities of market makers that are in the nature of brokers' activities and those that are not.[124/]  The mere fact that Defendants are "broker-dealers" does not mean that all transactions they participate in are "brokers' transactions."

In the present case, the complaint alleges that Defendants were operating in their capacity as market makers.  It does not specify whether the quotations that led to the sales to Plaintiffs were for Defendants' own account, were based on a retail customer's unsolicited buying or selling instructions, or were made in the "broker's broker" role described above.  Because Defendants bear the burden of establishing their entitlement to an exemption from registration, this uncertainty prevents Defendants from obtaining dismissal of Plaintiffs' Section 12(a)(1) claim on the basis of the brokers' exemption.

Given the Court's conclusion that Defendants have not met their burden of showing that the Biozoom sales were "brokers' transactions" within the meaning of Section 4(a)(4), the Court need not consider whether Defendants have demonstrated the exemption's other elements, such as a lack

---

[123](...continued)
24, 1964); SEC, Guide to Broker Dealer Registration, http://www.sec.gov/division/marketreg/bdguide.htm (last visited Feb. 2, 2015).

[124]Proposed Rule 11b-1 Regulating Specialists, 1964 WL 66987, at *1-2 ("A specialist performs two basic functions with respect to the issues in which he specializes.  First, as a broker's broker, he holds and executes orders entrusted to him by other brokers on behalf of the latter's customers. . . . The second important function of the specialist is to purchase and sells securities for his own account in order to assist in maintaining a fair and orderly market in each security in which he is registered.").  Other SEC material cited by Defendants in other portions of their arguments contains similar language.  See Publication or Submission of Quotations Without Specified Information, Exchange Act Release No. 39,670, 1998 WL 63592, at * 15 (Feb. 17, 1998) (describing circumstances where "the broker-dealer's activities would suggest that it is acting as a market maker, rather than a broker or dealer attempting to fill unsolicited customer orders.").

Case No. 1:14-CV-01087
Gwin, J.

of solicitation.[125]

* * *

In sum, Defendants may be able to avoid Section 12(a)(1) liability depending on what the evidence shows.  If Defendants can show that Plaintiffs' retail brokers purchased Biozoom stock as principals and then resold the Biozoom shares to Plaintiffs, then Section 12(a)(1)'s privity requirement will protect Defendants.  If Defendants can show that Biozoom (or Entertainment Art) shares were bona fide offered to the public more than forty days before the transactions at issue in this case, then Section 4(a)(3)'s dealer's exemption will protect them.  And if Defendants can show that they made the particular transactions in question in their capacity as brokers, then Section 4(a)(4)'s brokers' transactions exemption may protect them if they can also establish the exemption's other elements.

At this stage of the litigation, however, Plaintiffs have plausibly pled that Defendants sold directly to them, and Defendants have not met their burden of establishing their entitlement to either exemption from the registration requirement.  Accordingly, the Court will **DENY** Defendants' motion to dismiss Plaintiff Corso's Section 12(a)(1) claim against Defendant KCG.  As noted above, the Court will **GRANT** the motion to dismiss the remaining Plaintiffs' Section 12(a)(1) claims against the remaining Defendants as untimely.

**C. State Law Claims**

In addition to their Section 12(a)(1) claims, Plaintiffs bring a variety of state law claims.  In general, all Plaintiffs sue Defendants under New Jersey law.  Plaintiffs allege that the Bulletin Board

---

[125]Because the Section 12(a)(1) claims of all Plaintiffs except Corso fail on statute of limitations grounds, the above brokers' transaction exemption analysis applies directly only to Corso's claim.  If the statute of limitations did not defeat the other Plaintiffs' Section 12(a)(1) claims, the brokers' transaction exemption analysis would apply identically to the other Plaintiffs' Section 12(a)(1) claims.

Case No. 1:14-CV-01087
Gwin, J.

servers and software are in New Jersey and that this allows claims under New Jersey law. Each

Defendant is also sued under the law of its home state.

Defendants seek dismissal of all state law causes of action. Defendants argue first that these

claims are preempted either expressly or impliedly, and second, that Plaintiffs have failed to

plausibly allege the elements of each claim.

For the reasons below, the Court concludes that the state law claims are preempted except

for the breach of contract claims. However, Plaintiffs have not plausibly alleged all necessary

elements of their breach of contract claims.

### 1. Preemption

#### a. Express Preemption

Defendants say the state law claims are expressly preempted by the National Securities

Markets Improvements Act ("NSMIA"). Under this statute, any state "law, rule, regulation, or

order . . . requiring, or with respect to, registration or qualification of securities, or registration or

qualification of securities transactions" is preempted.[126] This provision applies to "covered

securities," which include securities traded in transactions that are exempt from registration under

the dealer's exemption or brokers' transaction exemption.[127]

Because of the Court's conclusion that the complaint allegations are sufficient to show these

exemptions may not apply, Defendants' argument for express preemption at this early stage fails.[128]

The Court therefore need not consider whether NSMIA preemption is broad enough to encompass

---

[126] 15 U.S.C. § 77r(a)(1).

[127] *Id.* § 77r(b)(4).

[128] *See Brown v. Earthboard Sports USA Inc.*, 481 F.3d 901, 912 (6th Cir. 2007) ("[The] NSMIA preempts state securities registration requirements only with respect to securities that actually qualify as 'covered securities' under federal law.").

Case No. 1:14-CV-01087
Gwin, J.

all of Plaintiffs' state law claims.

### b. Implied Preemption

Defendants next argue that SEC regulation of market makers' activity impliedly preempts the Plaintiffs' state law claims. Congress's express preemption treatment does not end the possibility of implied preemption and does not end the need to analyze the effect of individual state actions.[129]

"[S]tate laws are preempted when they conflict with federal law. This includes cases where compliance with both federal and state regulations is a physical impossibility and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[130] Federal regulations have the same preemptive effect as federal statutes.[131]

Defendants say that Rule 15c2-11 defines market makers' obligations with respect to collecting and maintaining information about securities they provide quotations for.[132] This rule includes a provision known as the "piggyback exception," which relieves market makers of these obligations when the security has recently been quoted on an interdealer quotation system such as the Bulletin Board with specified levels of frequency and regularity.[133] Under the piggyback exception, only the first market maker to post such a quotation, or those posting quotations soon afterwards, must usually comply with the information disclosure requirements.

The SEC has considered abandoning or sharply limiting the piggyback exception on multiple

---

[129]*Freightliner Corp. v. Myrick*, 514 U.S. 280, 287-89 (1995).

[130]*Arizona v. United States*, 132 S. Ct. 2492 (2012) (internal quotation marks and citations omitted).

[131]*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes.").

[132]*See* 17 C.F.R. § 240.15c2-11.

[133]*Id.* § 240.15c2-11(f)(3).

Case No. 1:14-CV-01087
Gwin, J.

occasions.[134] In effect, the suggested changes would have expanded disclosure requirements to reach most market makers.

In the process of pulling back from these proposed amendments, the SEC noted comments that additional registration and disclosure requirements would limit the number of market makers willing to offer their services.[135] Although the SEC sometimes responded to these comments by disputing the likely result,[136] it has never abolished or limited the piggy-back exception.  Thus, Rule 15c2-11 continues to limit market makers registration and disclosure obligations to early traders.

Defendants say that this regulatory scheme and history demonstrate the SEC's effort to encourage over-the-counter market liquidity by limiting market maker reporting and disclosure requirements.  Defendants say that more difficult disclosure requirements would decrease liquidity

---

[134] Initiation or Resumption of Quotations Without Specified Information, Exchange Act Release No. 27,247, 1989 WL 258020, at *17-20 (Sept. 14, 1989); Initiation or Resumption of Quotations Without Specified Information, Exchange Act Release No. 29,095, 1991 WL 292188 (Apr. 17, 1991); Publication or Submission of Quotations Without Specified Information, Exchange Act Release No. 39670, 1998 WL 63592, at *5-6 (Feb. 17, 1998); Publication or Submission of Quotations Without Specified Information, Exchange Act Release No. 41110, 1999 WL 95487 (Feb. 25, 1999).

[135] See, e.g., Initiation or Resumption of Quotations Without Specified Information, Exchange Act Release No. 29,095, 1991 WL 292188, at *4 (Apr. 17, 1991) ("Six commenters . . . indicated that the [piggyback exception] is a major feature of the Rule and is relied upon by many market participants.  Some of these commenters suggested that if the exception were eliminated or materially limited, broker-dealers might decide that it was uneconomical to continue making markets for many non-NASDAQ securities."); Publication or Submission of Quotations Without Specified Information, Exchange Act Release No. 39670, 1998 WL 63592, at *4 (Feb. 17, 1998) ("The Commission received 75 comment letters from 74 commenters in response to the 1991 Proposing Release.  The vast majority of commenters opposed the Commission's proposal.  These commenters believed that the proposal would discourage, or even eliminate, market making for many non-Nasdaq OTC securities.  They claimed the proposed amendments would have impaired liquidity, reduced market value, and harmed the capital -raising process.").

[136] See, e.g., Initiation or Resumption of Quotations Without Specified Information, Exchange Act Release No. 29,095, 1991 WL 292188, at *7 (Apr. 17, 1991) (giving reasons why "on balance, any additional costs associated with curtailment of the [piggybacking] exception would be justified"); Publication or Submission of Quotations Without Specified Information, Exchange Act Release No. 39670, 1998 WL 63592, at *6 (Feb. 17, 1998) ("The Commission recognizes that many commenters . . . raised issues about the perceived costs of compliance and the possible resulting loss of liquidity for some securities if the piggyback provision were eliminated and annual information updating were required.  As discussed below, the availability of the EDGAR system should reduce the information gathering and recordkeeping costs for those broker-dealers that publish quotes for the securities of reporting issuers.  Also, the Commission encourages the development of central repositories of information about issuers that are not participating in its public disclosure system.").

Case No. 1:14-CV-01087
Gwin, J.

on the secondary market because market makers may choose to leave the market rather than seek to obtain information that may not be readily available.  Accordingly, Defendants continue, allowing Plaintiffs' state law claims to go forward would impermissibly "undermine Congress's goal in creating the national market system and the SEC's goals in promulgating Rule 15c2-11."[137/]

The most analogous cases the parties have called to the Court's attention are a series of state high court cases Defendants cite dealing with "order flow payments."[138/]  Order flow payments are payments made by market makers to retail brokers as compensation for the retail brokers routing their clients' transactions through the market makers.  The plaintiffs in these suits had argued state agency law required either more complete disclosure of these payments than SEC regulations required or that the retail brokers pass along the payments to their customers.  The courts concluded that these state-law claims were preempted.

In reaching their conclusions, the courts pointed to several factors.  First, they noted that the 1975 Amendments to the Securities Exchange Act set forth Congressional policy to create a national market and gave the SEC wide regulatory latitude to encourage the creation of a national market.[139/]  Second, the state courts pointed out that the SEC had given the question of order flow payments specific consideration.  In doing so, the SEC had noted that order flow payments could be useful to investors by "lower[ing] execution costs, facilitat[ing] technological advances in retail customer order handling practices and facilitat[ing] competition among broker-dealers and securities markets,"[140/] and that allocating order flow payments to particular transactions could be difficult or

---

[137/]Doc. 103-1 at 4.

[138/]*Orman v. Charles Schwab & Co.*, 688 N.E.2d 620 (Ill. 1997); *Guice v. Charles Schwab & Co.*, 674 N.E.2d 282 (N.Y. 1996); *Dahl v. Charles Schwab & Co.*, 545 N.W.2d 918 (Minn. 1996).

[139/]*See, e.g.*, S. Rep. 94-75, at *2 (1975).

[140/]*See* Payment for Order Flow, Exchange Act Release No. 34,902, 1994 WL 587790, at *3 (Oct. 27, 1994).

Case No. 1:14-CV-01087
Gwin, J.

impossible.[141]

The state courts found that requiring retail brokers to attempt to allocate the payments, either for purposes of disclosure or for purposes of passing the payments along to clients, would effectively prohibit the use of order flow payments.  The state laws that would cause this result, the courts concluded, would conflict with federal law encouraging liquidity in and development of a national market and were therefore preempted.[142]

Although these cases are not controlling, and although other courts have concluded that state law agency claims relating to order flow payments are not preempted,[143] the Court finds the reasoning of the cases finding preemption analogous and persuasive.

In particular, the most important factors that animated the preemption decisions in the order flow payment cases are present here.  For example, the 1975 Securities Exchange Act Amendments' concern with promoting a national market applies with equal force.[144]  And just as it had with order flow payment, the SEC has extensively and repeatedly considered the question of requiring greater inquiry and disclosure of information by market makers.

It is true the SEC did not definitively conclude, like it did in the order flow payment context, that the increased regulatory burden associated with eliminating the piggyback exception would

---

[141]*See id.* at *7 ("More than 30 commenters expressed concern about the proposed requirement that broker-dealers disclose on customer order confirmations the amount of any [order flow payment].  Most of these commenters considered this unworkable.  In response to commenters' concerns, the Commission has modified the rule to require a statement on order confirmations that payment for order flow is received by the broker or dealer and that the source and nature of the payment for order flow received in connection with the particular transaction will be furnished on request of the customer.").  Thus, "[i]n response to commenters' concerns," the Commission changed its proposal to not require disclosure of the *amount* of compensation received in connection with particular transactions.  *See id.*

[142]*Orman v. Charles Schwab & Co.*, 688 N.E.2d 620 (Ill. 1997); *Guice v. Charles Schwab & Co.*, 674 n.E.2d 282 (N.Y. 1996); *Dahl v. Charles Schwab & Co.*, 545 N.W.2d 918 (Minn. 1996).

[143]*Thomas v. Charles Schwab & Co.*, Civ. A. No. 95-0307, 1995 WL 626522 (W.D. La. July 12, 1995); *Dumont v. Charles Schwab & Co.*, Civ. A. No. 95-0606, 1995 WL 262262 (E.D. La. May 4, 1995).

[144]*See, e.g.,* S. Rep. 94-75, at *2, 901 (1975).

Case No. 1:14-CV-01087
Gwin, J.

unacceptably hinder liquidity.[145/]  But after repeated consideration, the SEC did not tighten the

disclosure rules, always in the context of comments from market participants expressing just that

concern.[146/]  Moreover, although courts are often hesitant to find state Blue Sky laws preempted,[147/]

in this case the state law claims sufficiently clearly conflict with federal policy to overcome this

hesitation.

In effect, Plaintiffs' Blue Sky law, negligence, and unjust enrichment claims seek to impose

liability on Defendants under state law for failing to discover information that the SEC's rule does

not require them to obtain or disclose.[148/]  In doing so, they would conflict with the federal policy

favoring liquidity and the development of a national market.  These claims are therefore impliedly

---

[145]Indeed, the SEC has questioned this conclusion on multiple occasions.  *See, e.g.,* Initiation or Resumption of Quotations Without Specified Information, Exchange Act Release No. 29,095, 1991 WL 292188, at *7 (Apr. 17, 1991) (giving reasons why "on balance, any additional costs associated with curtailment of the [piggybacking] exception would be justified"); Publication or Submission of Quotations Without Specified Information, Exchange Act Release No. 39670, 1998 WL 63592, at *6 (Feb. 17, 1998) ("The Commission recognizes that many commenters . . . raised issues about the perceived costs of compliance and the possible resulting loss of liquidity for some securities if the piggyback provision were eliminated and annual information updating were required.  As discussed below, the availability of the EDGAR system should reduce the information gathering and recordkeeping costs for those broker-dealers that publish quotes for the securities of reporting issuers.  Also, the Commission encourages the development of central repositories of information about issuers that are not participating in its public disclosure system.").

[146]See, e.g., Initiation or Resumption of Quotations Without Specified Information, Exchange Act Release No. 29,095, 1991 WL 292188, at *4 (Apr. 17, 1991) ("Six commenters . . . indicated that the [piggyback exception] is a major feature of the Rule and is relied upon by many market participants.  Some of these commenters suggested that if the exception were eliminated or materially limited, broker-dealers might decide that it was uneconomical to continue making markets for many non-NASDAQ securities."); Publication or Submission of Quotations Without Specified Information, Exchange Act Release No. 39670, 1998 WL 63592, at *4 (Feb. 17, 1998) ("The Commission received 75 comment letters from 74 commenters in response to the 1991 Proposing Release.  The vast majority of commenters opposed the Commission's proposal.  These commenters believed that the proposal would discourage, or even eliminate, market making for many non-Nasdaq OTC securities.  They claimed the proposed amendments would have impaired liquidity, reduced market value, and harmed the capital -raising process.").

[147]*See LeRoy v. Great W. United Corp.*, 443 U.S. 173, 182 n.13 (1979) (citing the legislative history of the Securities Exchange Act of 1934); *Guice v. Charles Schwab & Co.*, 674 N.E.2d 282, 291 (N.Y. 1996) (quoting *LeRoy*).

[148]At oral argument, Plaintiffs contended that their state law causes of action did not conflict with Rule 15c2-11 because they did not impose any greater burden on market makers than that rule.  Doc. 125 at 66.  But Plaintiffs fail to explain how their state law claims, which do not appear to include anything analogous to the piggyback exception, would not impose a greater burden on market makers protected by the piggyback exception.

-35-

Case No. 1:14-CV-01087
Gwin, J.

preempted.[149]

By contrast, Plaintiffs' state law breach of contract claims are not impliedly preempted. Although state mandated additional disclosure would conflict with the promotion of liquidity and the development of a uniform national market, private agreements for additional disclosure would not. Market makers who do not want to subject themselves to contractually required informational obligations could simply not agree to contracts requiring them to obtain additional information. Meanwhile, nothing in the SEC's rule suggests a prohibition on obtaining and disclosing additional information if a market maker so desires.

Accordingly, the Court concludes that Plaintiffs' breach of contract claims are not impliedly preempted, but that Plaintiffs' other state law claims are.

**2. Contract Claims**

### a. Existence of Contracts

Plaintiffs breach of contact claims generally allege that Plaintiffs entered contracts with Defendants and the contracts required Defendants to deliver registered and freely tradable shares of Biozoom stock to Plaintiffs. Plaintiffs say Defendants breached these contracts by delivering shares that were not registered or freely tradable.

Defendants argue that Plaintiffs cannot bring breach of contract claims because there is no privity between Plaintiffs and Defendants. For the same reasons this argument failed when advanced with regard to Section 12(a)(1), it fails here as well.

Defendants also say that the complaint fails to adequately allege the nature or existence of

---

[149]The Court notes that Defendants' argument that 15 U.S.C. § 77s further supports a finding of preemption is misplaced. Although Defendants are correct that this provision allows an exception for liability for "any act done or omitted in good faith in conformity with any rule or regulation of the Commission," by its own terms this immunity is limited to liability that arises from the Securities Act itself, not from state law. 15 U.S.C. § 77s(a).

Case No. 1:14-CV-01087
Gwin, J.

these alleged contracts.  Defendants assail the complaint for failing to "identify, attach, quote from, or even reference the terms of any contract."[150]/  This criticism misses the mark.  As long as Plaintiffs plausibly plead offer, acceptance, consideration, and the contract's relevant terms, they do not need to attach or quote from the agreements.

The complaint is deficient, however, because Plaintiffs have not plausibly alleged the existence of a agreement to deliver registered shares.  Although Plaintiffs state that such an agreement exists, the Court finds this allegation implausible in light of the conceded fact that Defendants had no direct contact with Plaintiffs.  Moreover, no such representation is implicit in the mere posting of quotations on the Bulletin Board, as such a finding would be inconsistent with the Court's implied preemption holding.

### b. Failure to Plead Damages

Furthermore, even if Plaintiffs did plausibly plead the existence of a contract term guaranteeing the delivery of registered securities, the breach of contract claims would still fail.  Contract damages typically consist only of the natural and foreseeable consequences of a breach.[151]/  In this case, the harm Plaintiffs suffered was caused by the pump-and-dump scheme, which Defendants had no part in.  It was not the lack of registration that caused the drop in share prices.

Plaintiffs respond by claiming that "the Defendants' breach, i.e., the offer and sale of unregistered securities, artificially inflated the price of Biozoom stock."[152]/  They say that the stock price fell "once Defendants' conduct was revealed and the SEC suspended trading," and that

---

[150]Doc. 103-1 at 17.
[151]*See* Restatement (Second) of Contracts § 351 (1981).
[152]Doc. 116 at 20.

Case No. 1:14-CV-01087
Gwin, J.

therefore "[b]ut for Defendant's breach, Plaintiffs would not have experienced a loss in value of their Biozoom shares."[153]

This response is unavailing. But-for causation is not the only requirement for contract damages. Rather, Plaintiffs must also plausibly plead that the alleged harm was a natural and foreseeable consequence of the alleged breach. Here, it was the fraudulent pump-and-dump scheme that caused the loss. The existence of such a scheme is not a natural and foreseeable consequence when unregistered securities are sold.

Nor can Plaintiffs circumvent this conclusion by pointing instead to the SEC's stop order and arguing that the sale of unregistered shares led to the stop order. Even if that were the case–an issue the Court need not decide–the stop order no more caused the Plaintiffs' losses than did the lack of registration itself. Instead, the loss occurred because the market became aware of the fraud.

The Court will thus **GRANT** Defendants' motion to dismiss the contract claims.

\* \* \*

As set out in more detail above and in the conclusion, the Court **GRANTS** the Defendants' motion to dismiss Plaintiffs' state law claims.

### III. Conclusion

In sum, the Court **GRANTS** Defendants' motion to dismiss Count 1 on statute of limitations grounds as to all Defendants except KCG, **GRANTS** Defendants' motion to dismiss all of Plaintiffs' state law claims except the breach of contract claims due to implied preemption, and **GRANTS** Defendants' motion to dismiss Plaintiffs' breach of contract claims because Plaintiffs have not plausibly pled an agreement to deliver registered securities and have not plausibly pled contract

---

[153]*Id.*

-38-

Case No. 1:14-CV-01087
Gwin, J.

damages.  Defendants' motion to dismiss Count 1 as to KCG is **DENIED**.

IT IS SO ORDERED.

Dated: February 26, 2014

s/       *James S. Gwin*
JAMES S. GWIN
UNITED STATES DISTRICT JUDGE